### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

**FRANK KEVIN KENNEDY, ET AL.**                    **CIVIL ACTION**

**VERSUS**                                         **NO. 22-4591**

**SHELL USA, INC., ET AL.**                        **SECTION: "P" (2)**

<u>**ORDER AND REASONS**</u>

Before the Court is the Motion for Summary Judgment filed on behalf of Defendants Shell Offshore Inc., Shell Exploration & Production Company, Joseph "Jay" Hollis, and Allen Rollins (collectively, "Shell Defendants").[1] Plaintiffs filed an opposition to the motion,[2] and the Shell Defendants filed a reply in support of their motion.[3] Having considered the motion, the parties' briefing, the record, and the applicable law, the Shell Defendants' Motion for Summary Judgment (R. Doc. 96) is **GRANTED** for the following reasons.

## I.    BACKGROUND

Plaintiff, Frank Kevin Kennedy, instituted this action against numerous defendants, seeking damages for injuries Kennedy sustained while working on November 27, 2021.[4] At all relevant times, Kennedy was employed by Helmerich & Payne, Inc. ("H&P").[5] On the date of the incident that caused his injuries, Kennedy was working for H&P aboard the PERDIDO spar, a permanently fixed platform located on the Outer Continental Shelf off the coast of Texas.[6] The PERIDIDO spar is owned by Shell Offshore Inc. and is used for offshore drilling and production.[7] H&P was Shell's independent contractor, pursuant to a Master Drilling Agreement between H&P and Shell.[8]

---

[1] R. Doc. 96.
[2] R. Doc. 102.
[3] R. Doc. 104.
[4] R. Doc. 65.
[5] R. Doc. 96-4 at 40:25–41:4.
[6] *See* R. Doc. 60 at 5.
[7] R. Doc. 102-3.
[8] R. Doc. 96-3.

H&P's rig, Rig 205, sits atop Shell's PERDIDO spar.[9] On the night Kennedy was injured, all drilling activity had ceased, and H&P was in the early phases of a weeks-long project to replace the derrick on Rig 205.[10] According to Kennedy, the old derrick was "rusted to all hell and back" and needed to be decommissioned and taken down.[11] As part of the derrick-decommissioning project, the weight bucket—a counterweight used as part of a pulley system to suspend heavy tools over well bores during drilling operations—needed to be strapped to the derrick to prevent the weight bucket from moving when the derrick was being taken down.[12] H&P assigned Kennedy the task of ratchet strapping the weight bucket to the derrick.[13]

Because the weight bucket was located about 90 feet above the rig floor, Kennedy was instructed by his H&P supervisor to use a man-rider to complete this task.[14] Kennedy described the man-rider as a wooden seat, with a harness that is attached to a cable and winch system, used to lift people to work at heights above the rig floor.[15] The man-rider also included "fall protection," which consisted of a "safety lanyard," *i.e.*, a short cable, that was attached to Kennedy's harness on one end and a brake mechanism on the other end.[16] The brake mechanism was connected to a static line, which Kennedy described as a basic cable hanging from the center of the derrick, at the very top of its crown, and extending all the way down to just about six inches above the rig floor.[17] According to Kennedy, the brake mechanism is designed to slide up the static line as the person ascends in the man-rider, but the brake mechanism will not slide downward.[18] Thus, if the person

---

[9] R. Doc. 102-3 at 34; R. Doc. 96-4 at 101:15–102:11.
[10] R. Doc. 96-4 at 79:16–80:1, 83:12–15.
[11] R. Doc. 96-4 at 81:22–82:10.
[12] R. Doc. 96-4 at 99:16–105:19.
[13] R. Doc. 96-4 at 99:1–15.
[14] R. Doc. 96-4 at 99:1–15, 105:20–25.
[15] R. Doc. 96-4 at 132:1–133:2.
[16] R. Doc. 96-4 at 121:15–123:2.
[17] R. Doc. 96-4 at 121:18–24.
[18] R. Doc. 96-4 at 121:24–122:1.

were to start to fall, the brake would not move downward and would instead hold the person in place to prevent the fall.[19]

Relevant to Kennedy's theory of liability in this case, the weight bucket was located a few feet higher than the derrick's monkey board—a small platform that extends outwards from the derrick.[20] Accordingly, in order to reach the height of the weight bucket, Kennedy had to be hoisted in the man-rider above the monkey board.[21]

While in the man-rider, Kennedy was not in control of its movement.[22] Jacob Paulk, an H&P floor hand, was operating the man-rider's controls to move Kennedy up and down.[23] Kennedy was able to communicate with Paulk via a radio that they each wore.[24] There were numerous other H&P employees and one Shell employee, Claire El Hayek, who were on the rig floor during Kennedy's man-riding operation.[25]

Prior to his ascent, Kennedy checked his equipment, and everything was fine.[26] According to Kennedy, he ascended approximately 90 feet in the air on the man-rider, while placing his hands on nearby steel cables to help guide him up.[27] During his ascent, his safety lanyard, which was attached to the brake mechanism on the static line, moved with him.[28] As Kennedy approached the height where he would ratchet strap the weight bucket to the derrick, he threw out his left arm to signal it was time to stop his ascent.[29] He continued to move upward for a brief period even after giving the arm signal, but then, suddenly, he felt his harness tighten around him, and he was flipped

---

[19] R. Doc. 96-4 at 122:20–132:2.
[20] R. Doc. 96-4 at 105:20–106:24.
[21] Id.
[22] R. Doc. 96-4 at 111:2–8.
[23] R. Doc. 96-4 at 107:18–108:4, 110:22–111:1.
[24] R. Doc. 96-4 at 111:2–8, 131:2–5.
[25] R. Doc. 96-4 at 114:8–115:7.
[26] R. Doc. 96-4 at 123:3–10, 130:11–131:5
[27] R. Doc. 96-4 at 116:24–117:3, 118:21–121:2, 133:3–10.
[28] R. Doc. 96-4 at 133:11–134:18.
[29] R. Doc. 96-4 at 143:13–144:4.

somewhere between 90 and 180 degrees sideways and was hanging at that angle in the air.[30] Kennedy testified no one was watching him on his ascent, but after the winch system stopped moving, and he was flipped in the air, everyone on the rig floor looked up, and he was brought down within seconds.[31]

Kennedy did not see what caused the incident.[32] After he was back on the rig floor, however, he was told by other H&P employees that the static line got tangled in the fingers of the monkey board.[33] According to Kennedy, when the static line got tangled in the monkey board, it triggered the braking mechanism, which was trying to stop Kennedy from moving, but, at the same time, the winch system was still operating and was trying to move Kennedy upward.[34] This resulted in Kennedy's harness tightening around him and him being flipped in the air.[35] Kennedy suffered injuries to his neck, shoulder, arm, and groin area.[36] As of April 2025, he remained disabled and unable to return to work.[37]

Kennedy originally named H&P and its related entities as defendants in this lawsuit but has since dismissed his claims against H&P with prejudice.[38] The remaining named defendants are Shell Offshore Inc., as the alleged owner of the PERDIDO; Shell Exploration & Production Company, as an entity related to Shell Offshore Inc. and allegedly engaged in the operations of the PERDIDO; and Jay Hollis and Allen Rollins, two Shell employees who Kennedy alleges had a duty to ensure the operations on the PERDIDO were carried out safely.[39]

---

[30] R. Doc. 96-4 at 150:18–151:21, 152:21–154:8.
[31] R. Doc. 96-4 at 150:5–17, 155:9–14.
[32] R. Doc. 96-4 at 148:15–18.
[33] R. Doc. 96-4 at 148:17–149:18.
[34] R. Doc. 96-4 at 144:21–145:17.
[35] *Id.*
[36] R. Doc. 96-4 at 195:6–196:7.
[37] R. Doc. 96-4 at 209:18–211:4.
[38] R. Doc. 84.
[39] *See* R. Doc. 65.

It has already been determined that Texas state law governs this action as surrogate federal law under the Outer Continental Shelf Lands Act.[40] And Plaintiffs have confirmed that Kennedy's theories of liability against the Shell Defendants consist of claims of negligence and premises liability under Texas state law.[41] Kennedy's children, Jacob Kennedy and Kristen Kennedy, are also plaintiffs in this action and assert loss of consortium claims against the Shell Defendants.[42]

The Shell Defendants now move for summary judgment on all claims brought against them, arguing Plaintiffs lack evidence to support their claims.[43]

## II.    LEGAL STANDARD

Summary judgment is proper when the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[44] When the dispositive issue raised in a motion for summary judgment is one on which the nonmovant will bear the burden of proof at trial, the movant may satisfy its burden by pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim.[45]  The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing a genuine dispute of material fact exists.[46] The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for resolution.[47]

---

[40] *See* R. Doc. 60.
[41] *See* R. Doc. 60 at 9.
[42] R. Doc. 65 at ¶ 21.
[43] R. Doc. 96.
[44] FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).
[45] *See Celotex*, 477 U.S. at 325.
[46] *See id.* at 324.
[47] *See, e.g., id.*; *Little*, 37 F.3d at 1075 (quoting *Celotex*, 477 U.S. at 322) ("Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'").

A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under the applicable law in the case.[48] A dispute about a material fact is "genuine" if it is one upon which a reasonable jury could return a verdict for the nonmoving party based upon the jury's resolution of the particular factual issue.[49] "When assessing whether a dispute as to any material fact exists, [the Court] consider[s] all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."[50]

## III.    LAW AND ANALYSIS

### A.    Negligence

Under Texas law, the elements of a negligence claim are (1) a legal duty on the part of the defendant; (2) breach of that duty; and (3) damages proximately resulting from that breach.[51]

#### 1.    Hollis and Rollins

In the operative complaint, Kennedy asserts claims against Defendants Hollis and Rollins, in their individual capacities, based on Hollis and Rollins's alleged negligence. Defendants move to dismiss Kennedy's negligence claims against them, arguing Kennedy cannot present evidence showing that Hollis or Rollins breached any duty owed to him.[52]   In the opposition to the instant motion for summary judgment, Kennedy contends Hollis and Rollins were negligent in choosing Claire El Hayek to serve as the Shell night representative while knowing that El Hayek lacked the requisite knowledge and experience. Kennedy claims El Hayek's lack of experience directly contributed to his injuries.

---

[48] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[49] *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 (5th Cir. 1993).
[50] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins.*, 530 F.3d 395, 398–99 (5th Cir. 2008) (first citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); and then citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).
[51] *Van Horn v. Chambers*, 970 S.W.2d 542, 544 (Tex. 1998).
[52] R. Doc. 96-1 at 9.

Under Texas law, however, "employees . . . are not personally liable for their negligent acts committed within the scope of their employment unless they owed [and breached] an independent duty of reasonable care to the plaintiff."[53] Here, the negligent acts Kennedy relies on were performed within the scope of Hollis and Rollins's employment with Shell. Kennedy has not alleged or pointed to any evidence showing that Hollis or Rollins breached any independent duty of reasonable care owed to him. Accordingly, Hollis and Rollins are entitled to summary judgment on Kennedy's negligence claims against them in their individual capacities.

### 2. Shell Offshore Inc. and Shell Exploration & Production Company

Kennedy also asserts negligence claims against Defendants Shell Offshore Inc. and Shell Exploration & Production Company. Defendants move for summary judgment on Kennedy's claims against the Shell entities, arguing that Kennedy cannot prove the necessary elements of his negligence claims against them because Shell did not owe or breach any duty to Kennedy. Under Texas law, "[t]he general rule is that an owner or occupier of a premises does not have a duty to see that an independent contractor performs his work in a safe manner."[54] A duty to an independent contractor's employee does arise, however, if the owner or occupier retains some control over the manner in which the independent contractor performs its work.[55] Texas law recognizes two ways in which an owner or occupier can retain the right to control an aspect of an independent contractor's work or project so as to give rise to a duty of care to that independent contractor's employees: (1) by contract or (2) by actual exercise of control.[56] Thus, whether Shell owed Kennedy a duty of reasonable care turns on whether Shell contractually retained or actually

---

[53] *Wallace v. Indus. Tank Cleaning Servs., LLC*, 3:22-CV-00297, 2023 WL 2568917, at *2 (S.D. Tex. Mar. 13, 2023) (citing *In Leitch v. Hornsby*, 935 S.W.2d 114 (Tex. 1996)).
[54] *Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1985).
[55] *Lee Lewis Const., Inc. v. Harrison*, 70 S.W.3d 778, 783 (Tex. 2001).
[56] *Id.*

exercised control over the work being performed that led to his injuries. Shell argues that Kennedy cannot establish either scenario because (1) Shell had no contractual right to control H&P or its employees, and (2) there is no evidence to suggest that Shell employees exercised any actual, operational control over Kennedy's work. The Court considers each argument in turn.

### a. Contractual Right to Control

A premises owner's duty of care to an independent contractor's employee can arise if the premises owner has contractually retained the right of supervisory control over the work on the premises.[57] "In determining whether an owner has retained this right to control, the standard is narrow. The right to control must be more than a general right to order work to stop and start, or to inspect progress."[58] "The supervisory control must relate to the activity that actually caused the injury and grant the owner at least the power to direct the order in which work is to be done or the power to forbid it being done in an unsafe manner."[59]

Section XVI of the Master Drilling Agreement between Shell and H&P states:

> **16.1 Independent Contractor.** CONTRACTOR is an independent contractor with respect to performance of all work hereunder and neither CONTRACTOR nor anyone employed by CONTRACTOR shall be deemed for any purpose to be the employee, agent, servant or representative of SHELL or performance of any work or service hereunder. **SHELL reserves no right to and shall have no direction or control of CONTRACTOR, its employees, its subcontractor employees, or agents except in the results to be obtained.** The work performed hereunder shall meet the approval of SHELL and be subject to the general right of inspection provided herein for SHELL to secure the satisfactory completion thereof.
>
> **16.2 SHELL Access.** CONTRACTOR shall perform and supervise all work hereunder, but SHELL'S representatives shall have unlimited access to the premises to determine whether work is being performed by CONTRACTOR in accordance with all of the

---

[57] *See Coastal Marine Serv. of Texas, Inc. v. Lawrence,* 988 S.W.2d 223, 225–26 (Tex. 1999).
[58] *Id.* at 226 (citing *Redinger v. Living, Inc.,* 689 S.W.2d 415, 418 (Tex. 1985)).
[59] *Id.* (first citing *Clayton W. Williams, Jr., Inc. v. Olivo,* 952 S.W.2d 523, 527 (Tex. 1997); then citing *Exxon Corp. v. Tidwell,* 867 S.W.2d 19, 23 (Tex. 1993); and then citing *Redinger,* 689 S.W.2d at 418).

> provisions of this Agreement and Drilling Order. SHELL'S representative shall have the right at all times to be on or about the rig and to have access to all reports, records, logs, samples and cores.[60]

Shell argues that under these provisions, Shell reserved no right and had no direction or control over H&P or its employees. Instead, H&P was solely responsible for performing and supervising all work performed under the MDA. Shell further contends that even if El Hayek was in the vicinity of the alleged incident, the MDA authorized her to be there, but she had no duty or authority to control or participate in Kennedy's work in any way under the MDA. Kennedy acknowledges these provisions but argues that Shell's retention of the right to operational control is found in a separate section of the MDA. Kennedy points to Section VI, titled "TAKEOVER BY SHELL," which states, in pertinent part:

> Time is of the essence in performance of this "Contract". In the event of unreasonably slow progress, carelessness, inattention or incompetence on the part of CONTRACTOR or in the event CONTRACTOR for any reason shall fail to supply sufficient properly skilled workmen or suitable tools, machinery and equipment for efficient performance of the work on any well hereunder or in the event CONTRACTOR neglects or willfully discontinues or delays commencement of work to be performed hereunder, then SHELL shall notify CONTRACTOR in writing of its dissatisfaction. If such condition is not corrected or if work is not commenced to remedy same to SHELL'S satisfaction within five (5) days of notice, SHELL shall have the option to terminate the "Contract" or take possession of the well, discontinue the drilling, completion or working over thereof, and dismantle or abandon same, being liable only for the work done by CONTRACTOR prior to such termination or takeover. If SHELL so elects, it may take possession of the well and any or all of CONTRACTOR'S tools, machinery and equipment at the well site and, through its own employees or some other contractor, drill, complete or work over such well to completion. SHELL shall also have such termination right after takeover of work on a well as provided below. If there should be imminent danger of a blowout or other well hazards, SHELL shall have the right to take over operations immediately and either discontinue, abandon, or continue drilling, completion or

---

[60] R. Doc. 96-3 at 12 (emphasis added).

working over. CONTRACTOR shall continue to have custody of and be responsible for its rig and the positioning, locating and maintaining of it, and SHELL or its representative shall have supervision and control of such facilities only to the extent of the drilling, completion, abandonment or working over or other operations involving the well.[61]

Kennedy contends that, through this provision of the MDA, "Shell retained the right to control virtually anything to do with Rig 205." Kennedy also cites to *Tovar v. Amarillo Oil Co.*, 692 S.W.2d 469 (Tex. 1985), arguing that, in *Tovar*, the Texas Supreme Court unequivocally held that contractual provisions nearly identical to Section VI of the MDA create the degree of control necessary for a duty of care to arise. In response, Shell argues, first, that Kennedy has overstated the control Shell retained under the MDA and, second, that the facts in *Tovar* are distinguishable from this case such that the holding of *Tovar* is inapplicable here. The Court agrees with Shell.

As previously stated, in determining whether an owner has retained the right to control, the standard is narrow: "the supervisory control must relate to the activity that actually caused the injury."[62] In *Tovar*, that standard was satisfied. There, the plaintiff (Tovar) was an employee of a drilling company, Moran Brothers, Inc.[63] Amarillo Oil Company hired Moran Brothers to drill a well on its lease.[64] During drilling operations, pressure built up in the hole because of the design of the blowout preventer, resulting in severe injuries to Tovar.[65] The drilling contract between Amarillo Oil and Moran Brothers specifically provided for a blowout preventer, and the bid sheet and drilling order specified that the kill line should not be used for a fill line on the blowout preventer.[66] At the time of the incident that caused Tovar's injuries, Moran Brothers used the kill

---

[61] R. Doc. 96-3 at 3–4.
[62] *Coastal Marine Serv. of Texas, Inc.*, 988 S.W.2d at 226 (citing *Redinger*, 689 S.W.2d at 418).
[63] *Tovar*, 692 S.W.2d at 470.
[64] *Id.*
[65] *Id.*
[66] *Id.*

line for a fill line, and Amarillo Oil was aware of that deviation.[67] Under the drilling contract, Amarillo Oil had the right to take possession of the well and discontinue drilling operations in the event of carelessness, inattention, or incompetency on the part of Moran Brothers.[68] The court of appeals held that Amarillo Oil did not owe Tovar a duty as a matter of law; but the Texas Supreme Court reversed the judgment of the court of appeals, explaining that the lower court's decision was in conflict with *Redinger*, wherein the Texas Supreme Court "held that when a general contractor exercises some control over a subcontractor's work, the general contractor may be liable for failure to exercise reasonable care in supervising the subcontractor's activity."[69]

*Tovar* is distinguishable from the instant case, though, because, in *Tovar*, Amarillo Oil's supervisory control under the drilling contract related to drilling operations—that is, Amarillo Oil could take possession of the well or discontinue drilling operations—and the activity that caused Tovar's injury was a drilling operation. Here, however, Shell's right to takeover under Section VI of the MDA is related to H&P's performance of work on any well under the Contract, and the only scenario under which Shell could have *immediately* taken over H&P's operations was if there was imminent danger of a blowout or other well hazard.[70] But Kennedy's injury was not caused by any work on a well or any well hazard. Rather, Kennedy testified that all drilling operations had ceased, and he was injured while performing work on H&P's Rig 205, specifically, decommissioning the old derrick on the rig.[71] Nothing in Section VI of the MDA gave Shell the right to control, stop, or takeover this decommissioning work. Thus, unlike in *Tovar*, any supervisory control retained by Shell under Section VI of the MDA does not relate to the activity that caused Kennedy's injury.

---

[67] *Id.*
[68] *Id.*
[69] *Id.*
[70] R. Doc. 96-3 at 3–4.
[71] R. Doc. 96-4 at 79:16–80:1, 83:12–15.

For these reasons, the Court concludes Kennedy has failed to show that Shell contractually retained the right to control the work that caused Kennedy's injury.

### b. Actual Exercise of Control

In the absence of a contractual right to control, to prevail on his negligence claims, Kennedy must show that Shell "actually exercised control over the manner in which the independent contractor's work was performed."[72] Merely recommending a safe manner for the independent contractor's employees to perform their work is insufficient to subject a premises owner to liability.[73] Instead, the premises owner must control the "means, methods, or details of the independent contractor's work."[74] Additionally, the control exercised must relate to the condition or activity that caused the plaintiff's injury.[75]

Shell argues there is no evidence that Shell exercised actual control over Kennedy's work. Shell points to Kennedy's deposition testimony wherein Kennedy testified that (1) H&P led the safety meetings; (2) H&P employees gave Kennedy the orders and instructions regarding his use of the man-rider; (3) Kennedy had no communications with Shell personnel regarding this task; (4) Kennedy would typically go to his H&P supervisors about information pertaining to his job, not Shell employees; and (5) H&P was the entity responsible for decommissioning the derrick.[76] Shell acknowledges that one of its employees, Claire El Hayek, was in Kennedy's vicinity at the time of the alleged incident, but Shell contends that Kennedy's deposition testimony confirms El Hayek did not instruct Kennedy or exercise operational control over his work.[77] Shell further argues that it had the contractual right to be present during H&P's work[78] and that, under Texas

---

[72] *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002).
[73] *Id.* at 607.
[74] *Elliott–Williams Co., Inc. v. Diaz*, 9 S.W.3d 801, 804 (Tex. 1999).
[75] *Hoechst-Celanese Corp. v. Mendez*, 967 S.W.2d 354, 357 (Tex. 1998).
[76] R. Doc. 96-1 at 8.
[77] *Id.*
[78] R. Doc. 96-1 at 5.

law, merely placing a safety employee at the job site does not give rise to a duty to intervene and ensure that an independent contractor's employee safely performs his work.[79]

In response, Kennedy first challenges the legal viability of Shell's motion, arguing that it should be denied because Shell only cites to Kennedy's deposition testimony (and not any other potential evidence, like testimony from El Hayek, Hollis, or Rollins) to support its argument that there is no evidence that Shell controlled Kennedy's work.[80] Kennedy's challenge lacks merit, as it is directly contrary to the well-established legal standard governing this motion for summary judgment. As explained above, Shell, as the moving party, bears the burden of establishing there is no genuine dispute as to any material fact.[81] Because the dispositive issue raised by Shell is one on which Kennedy will bear the burden of proof at trial, Shell may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of Kennedy's claim.[82] By citing to the deposition testimony of Kennedy describing H&P's control over his work, Shell has carried its burden. There is no requirement that Shell must provide additional evidence negating the elements of Kennedy's claim.[83] Instead, because Shell has carried its initial burden, the burden now shifts to Kennedy, who must, by citing to specific parts of material in the record, show that a genuine dispute of material fact exists.[84] Notwithstanding the fact that Kennedy's instant challenge is in conflict with this standard, Kennedy appears to understand the applicability of this burden-shifting framework, as his next argument is an attempt at showing a genuine dispute of material fact does exist.

---

[79] R. Doc. 96-1 at 8–9 (citing *Koch Ref. Co. v. Chapa*, 11 S.W.3d 153, 157 (Tex. 1999)).
[80] R. Doc. 102-1 at 10.
[81] *See* Fed. R. Civ. P. 56(a).
[82] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).
[83] *See id*. at 323; *see also* Fed. R. Civ. P. 56(c)(1).
[84] *Celotex Corp.*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c)(1)(A).

Indeed, Kennedy argues there is a genuine dispute of material fact regarding Shell's control over Rig 205 and Kennedy's man-riding operations because, according to Kennedy, the evidence shows (1) El Hayek and Hollis gave direction during the pre-tower meeting on the date of the incident, (2) H&P specifically advised its workers to follow Shell procedures for man-riding operations, and (3) El Hayek was responsible for supervising the conduct and safety of Kennedy's man-riding operations, including his ascent up the derrick.[85] In its Reply, Shell contends that what Kennedy has provided is "nothing but speculation and conjecture presented via complex footnote citations, which, when followed down to the bedrock evidence, does not support the arguments they make."[86] The Court agrees with Shell. As explained more fully below, the evidence cited by Kennedy fails to establish any genuine dispute of material fact regarding whether Shell exercised actual control over the work that caused Kennedy's injury.

With respect to Kennedy's argument that El Hayek and Hollis gave direction during the pre-tower meeting on the date of the incident, Kennedy cites to his deposition testimony, but this testimony fails to establish any actual direction or orders given by El Hayek or Hollis regarding Kennedy's man-riding operation. Kennedy testified that before every shift, the crew would attend pre-tower meetings, typically led by Walt Primer, an H&P employee, during which the crew would be informed about the work projected for that day.[87] Kennedy further testified that he attended the pre-tower meeting prior to the shift at issue in this case.[88] Kennedy testified that "pretty much the whole H&P crew" working that shift and "a lot of Shell reps," including Hollis and El Hayek, attended this pre-tower meeting.[89] The meeting was led by Walt Primer.[90] When asked whether

---

[85] R. Doc. 102-1 at 11.
[86] R. Doc. 104 at 7.
[87] R. Doc. 102-5 at 62:2–13; 62:18–21; 63:21–64:1.
[88] R. Doc. 102-5 at 85:19–24.
[89] R. Doc. 102-5 at 85:25–87:5
[90] R. Doc. 102-5 at 85:25–86:3.

Kennedy could remember if Hollis or El Hayek spoke at this meeting, Kennedy responded "I'm sure they spoke. They always speak. I mean, they just take everyday routine[.] Everybody will speak that is high up on the food chain."[91]

The mere fact that Hollis or El Hayek spoke at this routine meeting is not enough to create a genuine dispute of material fact as to Shell's actual control over Kennedy's man-riding task on the day in question. There is no evidence that Hollis or El Hayek gave some instruction during the pre-tower meeting related to the man-riding operation in which Kennedy would later participate. And to the extent Kennedy is asking the Court to infer that Hollis or El Hayek gave such an instruction based on the fact that they spoke at the meeting, Kennedy's other deposition testimony precludes the Court from making such an inference. Indeed, Kennedy testified that despite this pre-tower meeting, he did not know what he was going to be doing during his shift.[92] He further testified that Shell employees did not instruct him on his job duties and that he did not ever go to Shell employees for information pertaining to his job duties.[93] And, on the night in question, it is Kennedy's recollection that Wesley Warren, the H&P driller on duty, gave him the instruction to go up in the man-rider to complete the task in furtherance of the decommissioning of the derrick.[94] Thus, Kennedy's evidence fails to establish that Shell exercised any actual control over the work that caused Kennedy's injury.

Next, Kennedy argues that a genuine dispute of material fact exists regarding whether Shell exercised actual control over Kennedy's work because "H&P specifically advised its workers to follow Shell procedures for man riding operations."[95] The sole citation in support of this assertion

---

[91] R. Doc. 102-5 at 87:21–88:3.
[92] R. Doc. 102-5 at 91:10–16.
[93] R. Doc. 102-5 at 88:11–90:4.
[94] R. Doc. 102-5 at 99:1–99:15.
[95] R. Doc. 102-1 at 11.

is paragraph 51 of Plaintiff's Statement of Material Facts, which states "H&P prepared a Power Point presentation entitled 'R205 MAST WORK SCOPE KICKOFF MEETING.'"[96] Paragraph 51 then cites to the document attached to Plaintiff's Opposition at Exhibit D as its evidentiary support. But the document attached at Exhibit D neither mentions Shell nor references man-riding procedures.[97] It appears Plaintiffs have attached the wrong document, as the Bates numbers Plaintiffs cite in their Statement of Material Facts in reference to this PowerPoint do not match the Bates numbers on the document that was provided.[98] Under Federal Rule of Civil Procedure 56(e), if a party fails to properly support an assertion of fact, the Court may give that party an opportunity to properly support the fact or may issue any other appropriate order.[99] Here, the Court finds it would be futile to give Kennedy an opportunity to support these assertions of fact by providing the proper document, because, for the reasons set forth below, even if Kennedy has evidence to support his factual assertions about this PowerPoint, the factual assertions themselves do not support his argument that "H&P specifically advised its workers to follow Shell procedures for man riding operations."

In paragraphs 51 through 54 of Plaintiff's Statement of Material Facts, Kennedy states that H&P prepared the PowerPoint at issue;[100] that the PowerPoint "addressed many issues regarding the removal of Rig 205's mast and installation of a new one;"[101] that "[o]ne of those issues was the work plan for the project;"[102] that H&P's PowerPoint "also addressed specific procedures for 'Manriding Operations'—the very operations that caused Kennedy's injuries;"[103] and that on the

---

[96] R. Doc. 102-2 at ¶ 51.
[97] *See* R. Doc. 102-6.
[98] *Compare* R. Doc. 102-2 at ¶¶ 52–54 (referencing documents Bates numbered H&P-Kennedy 000883, 000892, and 000893), *with* R. Doc. 102-6 (reflecting Bates numbers H&P-Kennedy 001059–001061).
[99] FED. R. CIV. P. 56(e).
[100] R. Doc. 102-2 at ¶ 51.
[101] R. Doc. 102-2 at ¶ 52.
[102] *Id.*
[103] R. Doc. 102-2 at ¶ 53.

Final Remarks slide of the PowerPoint, "H&P told its audience to 'Follow Shell and H&P Processes.'"[104] Even if the Court accepted these facts as true, despite their lack of evidentiary support, the Court finds that these facts fail to support Plaintiffs' argument that H&P *specifically advised* its workers to follow Shell procedures for *man-riding operations*. Rather, the relevant takeaways are that H&P created a PowerPoint presentation regarding the procedures to be used for the derrick-decommissioning project and that H&P included a *general instruction* at the end of its presentation, *unrelated to any specific task*, to follow Shell and H&P processes. These facts are insufficient to establish that Shell exercised any actual control over Kennedy's man-riding operations such that Shell owed a duty to Kennedy with respect to the safety his work. Accordingly, for purposes of the instant motion for summary judgment, the Court will not require Kennedy to properly support these factual assertions. Instead, the Court assumes that paragraphs 51 through 54 of Plaintiff's Statement of Material Facts are true and supported by the evidence. Even so, these factual assertions fail to create a genuine dispute of material fact regarding whether Shell exercised actual control over the work that caused Kennedy's injury.

Finally, Kennedy contends there is a genuine dispute of material fact regarding Shell's operational control because "El Hayek was responsible for supervising the conduct and safety of Kennedy's man-riding operations," including his "ascent up the rig."[105] In support of this contention, Kennedy cites to his deposition testimony, wherein he testified that rather than using his radio as he was ascending up the derrick on the man-rider, the H&P tool pusher on duty and Claire El Hayek (the Shell representative on duty on the night of the incident) were supposed to be watching him for hand signals that he would give to stop his ascent.[106] When asked how

---

[104] R. Doc. 102-2 at ¶ 54.
[105] R. Doc. 102-1 at 11.
[106] *See* R. Doc. 102-2 at ¶ 93; R. Doc. 102-5 at 135:1–13.

Kennedy knew El Hayek was supposed to be supervising him, Kennedy stated:

> Years ago[,] a guy got hurt similar, pretty much exact same thing that happened to me. They put in process then that anything working above the monkey board, a company rep and tool pusher shall be on scene to observate [sic], in charge of everything going on, overseeing the job to where that would never happen again. You can't even go above the monkey board without a company rep there.[107]

Kennedy thus argues El Hayek had a "significant safety responsibility to monitor Kennedy's ascent up the rig."[108] And relying on the Southern District of Texas' holding in *Franks v. Chevron Corp.*, No. 3:06-cv-506, 2007 WL 2230296 (S.D. Tex. Aug. 13, 2007), Kennedy argues these facts he has presented are sufficient to defeat Shell's motion for summary judgment. In *Franks*, however, there was evidence that the premises owner had directly instructed the plaintiff to perform the activity that led to his injury.[110] There is no such evidence in this case. To the contrary, the evidence in the record is that an H&P employee, Wesley Warren, gave Kennedy the instruction to ride the man-rider on the night of the incident.[111]

The Court finds this case more akin to *Koch Refining Co. v. Chapa*, 11 S.W.3d 153 (Tex. 1999), the Texas Supreme Court case relied upon by Shell. In *Koch Refining Co.*, an independent contractor's employee (Chapa) was injured while performing work at a plant owned by Koch.[113] Chapa tried to argue that, despite Koch's status as the premises owner, Koch owed a duty to the independent contractor's employees to ensure that they safely performed their work because there was a Koch safety employee present at the site of the accident.[114] The Texas Supreme Court rejected Chapa's argument.[115] In doing so, the Court considered Chapa's testimony that "the Koch

---

[107] R. Doc. 102-5 at 138:10–22.
[108] R. Doc. 102-1 at 11.
[110] *Franks*, 2007 WL 2230296 at *7.
[111] R. Doc. 102-5 at 99:1–15.
[113] *Koch Refining Co.*, 11 S.W.3d at 154.
[114] *Id.* at 155–56.
[115] *Id.* at 156.

safety employee was present to 'tell us if we were to do something wrong, not to do it like that—not to go about it that way, to go about it a different way.'"[116] The Court also considered Chapa's co-worker's deposition testimony, wherein he answered "yes" when asked, "[I]f you are doing your job unsafely, the Koch people will make sure and remind you that you are doing [it] unsafely and make sure that you do the job in a safe manner?"[117] But the Court concluded that the testimony failed to establish "that Koch exercised the degree of control necessary to create a duty" because "[i]t is not evidence that [the independent contractor] and Chapa were not free to do the work in their own way and is not evidence that Koch controlled the method of work or its operative details."[118]

Similarly, here, Kennedy has not shown that he and the other H&P employees involved in the man-riding operation were not free to do the work in their own way or that Shell controlled the method of their work or its operative details. And, as the Texas Supreme Court explained in *Koch Refining Co.*, "[e]very premises owner must have some latitude to tell its independent contractors what to do, in general terms, and may do so without becoming subject to liability."[119] Thus, "a premises owner, merely by placing a safety employee on the work site, does not incur a duty to an independent contractor's employees to intervene and ensure that they safely perform their work."[120]

*    *    *

Without evidence that Shell contractually retained or actually exercised control over Kennedy's work, Kennedy cannot prevail on his negligence claims against the Shell entities.

---

[116] *Id.*
[117] *Id.*
[118] *Id.*
[119] *Id.* (citing *Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1985)).
[120] *Id.* at 157.

Accordingly, the Shell entities are entitled to summary judgment on Kennedy's negligence claims against them.

### B.    Premises Liability

The Shell entities next argue that Kennedy cannot prove the necessary elements of his premises liability cause of action against them.  Shell contends, and Kennedy does not dispute, that to prevail on a premises liability claim, Kennedy must prove four elements: (1) actual or constructive knowledge of a condition on the premises by the owner or occupier; (2) that the condition posed an unreasonable risk of harm; (3) that the owner or occupier did not exercise reasonable care to reduce or eliminate the risk; and (4) that the owner or occupier's failure to use such care proximately caused the plaintiff's injury.[121]

In the operative complaint, Kennedy's theory of premises liability is based on the "hoisting mechanism" that was used to lift workers into the air to perform mechanical work on the premises.[122] Kennedy alleged the hoisting mechanism and its component parts, "including but not limited to the primary and secondary cables, the winch, and the emergency braking system, were defective in their design and implementation," and that such defects caused Kennedy's injuries.[123]

Shell moves for summary judgment on this premises liability claim, arguing Shell had no notice of a defective condition on H&P's Rig 205.[124] Shell also points to Kennedy's deposition testimony, where he testified that (1) all of the equipment he was working with at the time of the incident was fine,[125] (2) there was no indication that there was anything wrong with the ropes, safety cables, brake, or anything else,[126] and (3) he personally inspected the brake to ensure that it

---

[121] R. Doc. 96-1 at 9 (citing *CMH Homes, Inc. v. Daenen*, 15 S.W.3d 97, 99 (Tex. 2000)).
[122] R. Doc. 65 at ¶ 11.
[123] *Id.*
[124] R. Doc. 96-1 at 9.
[125] R. Doc. 96-4 at 130:11–22.
[126] R. Doc. 96-4 at 128:18–23.

was working properly prior to his ascent.[127] Shell argues that based on this testimony, Kennedy has failed to establish, or even identify, a defective or unreasonably dangerous condition, and, therefore, any alleged premises liability claim must fail.[128]

In opposition, Kennedy argues that Shell's argument that it lacked notice is unsupported and contradicted by Kennedy's deposition testimony.[129] In particular, Kennedy argues "Shell had plenty of knowledge regarding the dangers of using a safety lanyard attached to the derrick's static line for man riding operations above the monkey board. And yet, Shell and H&P still sent Kennedy up there."[130] Kennedy cites to the portion of his deposition where he testified that years ago someone was injured in the same way he claims he was injured, and as a result a new safety procedure was put in place that required a company representative and tool pusher to be on scene to observe anytime someone was working above the monkey board.[131]

In reply, Shell argues the evidence Kennedy relies on is hearsay within hearsay and, thus, is not competent summary judgment evidence.[132] Shell further argues that even if it was competent summary judgment evidence, it is not evidence of a premises defect on H&P's Rig 205 on the date of the accident in this case.[133]

The Court need not address the challenge to the admissibility of the testimony Kennedy relies upon, however, because the Court that agrees that Kennedy has not pointed to any evidence of a *condition on the premises* that caused Kennedy's injuries. Kennedy's argument in his opposition memorandum relates to Shell's knowledge regarding the dangers of the *method of*

---

[127] R. Doc. 96-4 at 123:3–10.
[128] R. Doc. 96-1 at 10.
[129] R. Doc. 102-1 at 15–16.
[130] R. Doc. 102-1 at 16.
[131] *See* R. Doc. 102-1 at 16 (citing Plaintiff's Statement of Material Facts at ¶¶ 89–92); R. Doc. 102-2 at ¶¶ 89–92; R. Doc. 102-5 at 138:10–22.
[132] R. Doc. 104 at 3–4.
[133] R. Doc. 104 at 4.

*Kennedy's work*—that is, "the dangers of using a safety lanyard attached to the derrick's static line for man riding operations above the monkey board." But, to prevail on a premises liability claim, there must be a condition on the premises that presents an unreasonable risk of harm. Plaintiffs have not identified any such condition. Accordingly, the Shell entities are entitled to summary judgment on Kennedy's premises liability claims against them.

### C.    Remaining Claims

The Shell Defendants seek summary judgment on all Plaintiffs' claims, not just Kennedy's claims. In the operative complaint, Kennedy's children, Jacob Kennedy and Kristen Kennedy, assert a loss of consortium claim based on the injuries of their father. Loss of consortium is a derivative claim.[134] Because Kennedy cannot prevail on his claims against the alleged tortfeasors, Kennedy's children are not entitled to loss of consortium as a matter of law. Accordingly, the Shell Defendants are entitled to summary judgment on the loss of consortium claims as well.

As a final matter, Plaintiffs named several unidentified persons or entities as defendants in the operative complaint—namely, "Claire," "Insurer 1," "Insurer 2," and "Insurer 3." However, the Federal Rules of Civil Procedure provide no authority for joining unidentified, fictitious defendants in a civil proceeding.[135] Accordingly, these unidentified defendants are not considered defendants in this proceeding, and this Order and Reasons resolves all claims between all parties that remain in this case.

## IV.    CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that the Shell Defendants' Motion for Summary Judgment (R. Doc. 96) is **GRANTED**, and all of Plaintiffs' claims in this action against

---

[134] *Motor Exp., Inc. v. Rodriguez*, 925 S.W.2d 638 (Tex. 1996).
[135] *See Randolph v. London*, No. 09-0179-FJP-CN, 2010 WL 128318, at *1 n.1 (M.D. La. Jan. 12, 2010), *aff'd,* 400 F. App'x 894 (5th Cir. 2010).

the Shell Defendants are **DISMISSED WITH PREJUDICE**. Judgment will be entered in accordance with this Order and Reasons and the Federal Rules of Civil Procedure.

      **IT IS FURTHER ORDERED** that the Shell Defendants' Rule 12(b)(6) Motion to Dismiss (R. Doc. 68) is **DENIED AS MOOT**.

      New Orleans, Louisiana, this 26th day of January 2026.

**DARREL JAMES PAPILLION**
**UNITED STATES DISTRICT JUDGE**